George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

Arthur KELLEY, d/b/a Arthur Kelley Stockyards, Defendant-Appellant.

No. 720–69.

United States Court of Appeals, Tenth Circuit.

Sept. 30, 1970.

William D. Lunn, Muskogee, Okl. (Wilcoxen, Gephart, Lunn & Mayes and James K. Mayes, Jr., Muskogee, Okl., on the briefs), for appellant.

William Fauver, Atty., U. S. Dept. of Labor (Laurence H. Silberman, Sol. of Labor, Bessie Margolin, Associate Sol., Carin Ann Clauss, Helen W. Judd, Attys., and Major J. Parmenter, Regional Sol., U. S. Dept. of Labor, on the briefs), for appellee.

Before PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

George P. Shultz, in his capacity as Secretary of Labor, brought this action against Arthur Kelley, d/b/a "Arthur Kelley Stock Yards," seeking a decree enjoining Kelley from violating §§ 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act, as amended,[1] and from withholding payment of minimum wages and overtime compensation found by the court to be due from Kelley to his employees under that Act. From an adverse injunctive decree, Kelley has appealed.

Kelley is engaged in buying and selling hogs. He purchases hogs mainly at stockyards located in Nebraska, Iowa, Minnesota and Missouri. He owns a private stockyard adjacent to Muskogee, Oklahoma. He transports in his own trucks the hogs he purchases to his stockyard, where he unloads them and holds them from one to three days. While in his stockyard, the hogs are fed and watered and provided with water holes, where they can wallow and keep cool. He sells the hogs to meat processors in Oklahoma and Texas. He transports the hogs in his own trucks from his stockyard to the place of delivery to the purchaser. Each of the truck trailers has an upper and a lower deck. Each deck has five separate compartments.

From July 1967 to August 20, 1968, Kelley employed John Risenhoover to work for him at his stockyard. Risenhoover's duties were to unload the hogs from the trucks when they arrived at the stockyard and place the hogs unloaded from each truck into a separate pen, to feed and water the hogs, and to keep ample water in the water holes for the hogs to wallow in and keep cool, to clean the pens and keep the fences in proper repair, to repair the trailers and trailer compartments so they would be kept hog tight, and to assist in making mechanical repairs on the truck tractors. Such repairs on the trailers and the mechanical labor on the truck tractors were essential to keep the trailers and truck tractors in safe operating condition.

It was also Risenhoover's duty to load the trailers. The loading procedure was as follows: Kelley would separate and drive six hogs from their pen to a loading pen located at the lower end of the ramp. Risenhoover knew the compartment to which the first six hogs driven into the loading pen by Kelley were to be placed, and he knew into which of the remaining nine compartments each load of six hogs driven into the loading pen by Kelley were to be placed on the trailer. When Risenhoover had moved a lot of six hogs from

1. 29 U.S.C.A. § 201 et seq.

the loading pen and had started to load them, Kelley would separate another lot of six hogs and drive them into the loading pen.

It is true that in loading the hogs Risenhoover worked under Kelley's supervision, but as Kelley testified, it was Risenhoover's job to load the hogs into the proper compartments and see that the doors thereof were securely closed, so the hogs would be kept confined therein.

Balancing of the load and keeping it in balance while being transported was essential to the safe operation of the trucks.

Risenhoover testified that the trucks transporting hogs purchased by Kelley to his stockyard usually arrived in the morning, but that they could and did arrive at all hours of the day, and that he would be notified and was required to be there and meet them and unload the hogs; and that in cool weather the outgoing trucks were loaded and left between 4 p. m. and 9 p. m.; that in hot weather they were loaded and left between 9 p. m. and 12 midnight.

Kelley paid Risenhoover $75 per week for his services. He paid his truck drivers by the trip. He did not keep any records of hours worked, and his records of payments made to employees were mainly copies of Social Security tax reports.

Risenhoover testified that he reported for work between 7:30 and 8 a. m. and completed his work at from 5:30 p. m. to 12 midnight; that he had an hour off for lunch and an hour off for dinner, and that he worked seven days per week. He estimated that he worked from 56 to 72 hours per week.

William H. Smith, Jr., an investigator for the Wage and Hour and Public Contracts Division of the United States Department of Labor, testified that he investigated Kelley's business operations with respect to violations of the Fair Labor Standards Act. He stated that Kelley furnished him with copies of the Social Security tax reports on the earnings of Risenhoover in 1967. He further stated that from information he obtained from his investigation, he estimated that Risenhoover worked for Kelley 58 hours per week from the beginning of his employment in 1967 until February 1, 1968, during which time the minimum wage was $1.40 per hour; that Risenhoover received $75 per week and was entitled to $81.20 per week, which left a balance due him of $204.60; that he estimated that from February 1, 1968, to August 16, 1968, when the minimum wage was $1.60 per hour, Risenhoover worked for Kelley 58 hours per week; that he received $75 per week and was entitled to $92.80 per week, which left a balance due him of $516.20.

Smith further stated that from the information he obtained, he concluded that during such periods Risenhoover was doing work essential to the operation of the truck tractors and trailers, which he estimated consumed one-third of each workweek, and that while he was doing such work he was exempt from the overtime provisions of § 13 (b) (1) of the Fair Labor Standards Act, but that he was entitled to overtime compensation during the remaining two-thirds of each workweek, while he was employed in nonexempt work, which amounted to $665.20.

The court found that Risenhoover was entitled to recover additional compensation under the applicable minimum wage provisions of the Fair Labor Standards Act during the period from July 1967 to February 1, 1968, in the amount of $204.60, and for the period from February 1, 1968, to August 16, 1968, in the amount of $516.20, and for the period from August 17 to August 20, 1968, for which he was not paid any compensation, he was entitled to $52.

The court made findings of fact and conclusions of law, and after a motion for a new trial, made amended findings of fact and conclusions of law.

In Amended Finding III, the court found that:

" * * * Risenhoover's duties consisted of helping to unload the hogs

coming into the yards on defendant's trucks from points outside Oklahoma, feeding and watering such hogs, cleaning the yards and pens, repairing the fences of the stock yards, repairing the trailers used to haul the hogs, performing some minor repairs to the trucks used to haul the hogs, and helping to load the hogs to be hauled on to points in Oklahoma and Texas. Defendant himself supervised and directed the loading and unloading of the hogs and Risenhoover helped him, carrying out Kelley's orders and instructions."

The finding last quoted, insofar as it deals with loading and unloading the hogs, is contrary to the testimony of Kelley and Risenhoover. Kelley testified, "I keep a man there (referring to the stockyard) generally that will unload the hogs." In response to the question, "Did Mr. Risenhoover help unload the hogs?" Kelley answered, "He was supposed to unload them. That was his job."

Referring to Risenhoover's tour of duty, Kelley testified:

"It could be any time, day or night, just like any stockyards. They bring the hogs, when he knowed they was coming he was supposed to receive them. When he knowed they was going, he was supposed to load them. That was his job."

As stated, supra, Risenhoover testified it was his job to unload the hogs. Both Kelley and Risenhoover testified to the loading process, as set out in the text of this opinion, supra.

2. Interstate Commerce Commission.

3. The powers and duties of the Interstate Commerce Commission to establish qualifications and maximum hours of service of employees under § 204(a) (1) of the Motor Carrier Act of 1935 was transferred to the Department of Transportation by the Act of October 15, 1966, 49 U.S.C.A. § 1655(e) (6) (c).

In its report, "In the Matter of Maximum Hours of Service of Motor Carrier Employees," Ex Parte No. MC–2, 28 M.C.C. 125, et seq., decided March

29 U.S.C.A. § 207(a) (1) in part here pertinent reads:

"Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed; * * *."

29 U.S.C.A. § 213(b) (1) in part here pertinent reads:

"(b) The provisions of section 207 of this title shall not apply with respect to—

"(1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49; * * *."

49 U.S.C.A. § 304(a) (3), Act of August 3, 1956, in part here pertinent provides:

"(a) It shall be the duty of the Commission— [2]

*    *    *    *    *    *

"(3) To establish for private carriers of property by motor vehicle, * * * reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, * * *." [3]

4, 1941, the Interstate Commerce Commission, after reviewing judicial decisions, in part said:

" * * * We therefore conclude that under said section 204(a) we have power to establish qualifications and maximum hours of service with respect only to employees who devote a substantial part of their time to activities which directly affect safety of operation. Our task is thus narrowed to determining which employees of common and contract carriers and of private carriers of prop-

29 C.F.R. Part 782—(Exemption From Maximum Hours Provisions for Certain Employees of Motor Carriers) of a bulletin issued by the Department of Labor, and in effect at all times here material, sets forth the views of the Administrator of the Wage and Hour Division as to the scope and applicability of the exemption provided for by § 13(b) (1) of the Fair Labor Standards Act.

29 C.F.R. § 782.5 in part reads:

"§ 782.5 *Loaders.*

"(a) A 'loader,' as defined by the the Interstate Commerce Commission, is an employee of a carrier subject to section 204 of the Motor Carrier Act (other than a driver or driver's helper as defined in §§ 782.3 and 782.4) whose duties include, among other things, the proper loading of his employer's motor vehicles so that they may be safely operated on the highways of the country. A 'loader' may be called by another name, such as 'dockman,' 'stacker,' or 'helper,' and his duties will usually also include unloading and the transfer of freight between the vehicles and the warehouse, but he engages, as a 'loader,' in work, directly affecting 'safety of operation' so long as he has responsibility, when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized."

It will be observed that under the above interpretation, an employee is a loader if he engages for a substantial part of his working time in the proper loading of his employer's motor vehicles, so that they may be safely operated on the highways, so long as he has responsibility while such motor vehicles are being loaded for exercising judgment and discretion in (1) planning and building a balanced load or (2) placing, (3) distributing, or (4) *securing the pieces of freight* (here, hogs) in such a manner that the safe operation of the motor vehicles on the highways in interstate or foreign commerce will not be jeopardized.

Counsel for the Secretary, in their brief, asserted that Risenhoover was not responsible "for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the piece of freight (here, hogs) in such a manner that the safe operation of" the trucks

---

erty by motor vehicle, engaged in interstate or foreign commerce, fall within that category. (p. 132)

"Our findings of fact and conclusions of law are as follows:

"*Findings of fact.*—1. That mechanics employed by common and contract carriers and private carriers of property by motor vehicle, subject to part II of the Interstate Commerce Act, devote a large part of their time to activities which directly affect the safety of operation of motor vehicles in interstate or foreign commerce. (p. 138)

"2. That loaders, as above defined, employed by common and contract carriers and private carriers, of property by motor vehicle subject to part II of the Interstate Commerce Act devote a large part of their time to activities which directly affect the safety of operation of motor vehicles in interstate or foreign commerce. (p. 139)

"*Conclusions of law.*—1. That the term 'safety of operation' as used in section 204(a) of part II of the Interstate Commerce Act, means the safety of operation of motor vehicles in the transportation of passengers or property in interstate or foreign commerce, and that alone. (p. 139)

"2. That our jurisdiction to prescribe qualifications and maximum hours of service for employees of common and contract carriers and private carriers of property by motor vehicle is limited to those employees who *devote a substantial part of their time* to activities which directly affect the safety of operation of motor vehicles in the transportation of passengers or property in interstate or foreign commerce." (p. 139) (Emphasis ours.)

"on the highways in * * * commerce will not be jeopardized."

Risenhoover was responsible for moving each lot of hogs into the proper compartment, that is, in doing his work properly, but, significantly, he was also primarily responsible for keeping the compartment gates and the means for keeping them closed in proper repair and for fastening the gates shut by such means after he had loaded the hogs into the compartments, so that the hogs would be secured in such a manner that the safe operation of the trucks on the highways would not be jeopardized. If Risenhoover discovered the means for holding the gates shut was out of repair, it is reasonable to infer that it was his duty to report that fact, so the trucks would not be permitted to move on the highways until such repairs had been made by him and the gates were securely shut.

The evidence tends to support the contention of Kelley that Risenhoover spent a substantial part of his time as Kelley's employee in performing the duties of loading the hogs from the loading pen into the trailer compartments and securely fastening the compartment gates, and that the manner in which he performed those duties directly affected the safety of the operation of the trucks on the highways.

No doubt Kelley had instructed Risenhoover how to load the hogs, but the actual loading from the loading pen into the proper compartments and seeing that the compartment doors were securely closed were performed, as a part of his regular duties, by Risenhoover, and the manner in which he performed those duties directly affected the safety of the operation of the trucks on the highways.

However, since the question whether Risenhoover was a loader is a close one and is not likely to arise again, because Kelley's business is a rather unusual one, and since its determination will not change the result we have reached, we shall refrain from deciding it.

The interpretive bulletin of the Department of Labor, referred to above, setting forth the views of the Administrator of the Wage and Hour Division as to the scope and applicability of the exemption provided for in § 13(b) (1) of the Fair Labor Standards Act, 29 C.F.R. § 782.2(b) (1) and (2), reads in part as follows:

"§ 782.2 *Requirements for exemption in general.*

\*     \*     \*     \*     \*     \*

"(b) (1) The exemption is applicable, under decisions of the United States Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined by the Interstate Commerce Commission (1) as that of a driver, driver's helper, loader, or mechanic, and (2) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act. \*  \*  \*.

"(2) As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is * * * called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in subparagraph (1) of this paragraph, he comes within the exemption *in all workweeks when he is employed at such job.* This general rule assumes that *the activities involved in the continuing duties of the job in all such workweeks* will include activities which the Commission has determined directly affect the safety of operation of motor vehicles on the public highways in transportation in interstate commerce. *Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when*

*the employee happens to perform no work directly affecting 'safety of operation.'* On the other hand, where the *continuing duties* of the employee's job have no substantial direct effect on such safety of operation * * * the exemption will not apply to him in any workweek so long as there is no change in his duties. If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him in those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job." (Emphasis ours.)

Kelley testified that he had five trucks and used four, which we understand to mean that he used four at a given time and kept one in reserve.

In Amended Finding VI the trial court found that:

"Risenhoover worked at least 18 hours in excess of 40 each workweek he was employed by defendant, and for each overtime hour he should have been paid at one and one-half times his regular rate, except in those weeks when he repaired the trucks used to haul the hogs. Risenhoover performed such repair work in at least one-third of the weeks he worked for defendant. * * *."

After careful examination of the record as a whole, we conclude that the above finding of the court not only was clearly erroneous, but was indeed contrary to the evidence.

Smith, the investigator for the Department of Labor, testified in part as follows:

"Now each of these periods of time (1967 to February 1, 1968, and February 1, 1968, to August 16, 1968) I felt the man was doing some work some of the week essential to the safety of the operation of motor ve-

hicles, which I figured one third of the work week; so I deducted one third of the work week and the other two thirds of the week he was not doing safety effective work on motor vehicles for which he would be exempt under 13(b)(1), be due overtime * * *."

While testifying in his own behalf, Risenhoover was asked:

"All right, sir, if a load of hogs comes in in the morning and you unload them and that takes about an hour, what do you have to do the rest of the time for the work day?"

to which Risenhoover answered:

"You have to see about them hogs just every little while, and work on the trailers the biggest part of the time after that, * * *."

It is almost inconceivable that the wooden trailers required repairs only one week out of a three-week period in a continuing business like Kelley operated. Moreover, we find nothing in the evidence to justify the conclusion that he did such repair work on trailers or trucks only during one-third of the weeks he worked and did not do such repairing during two-thirds of the weeks he worked, as found by the court.

We are of the opinion that the evidence clearly established, without contradiction, that Risenhoover during the period of time he was employed by Kelley, devoted a substantial part of his working time each week to the performance of his duties of repairing the trucks, and that such activities of Risenhoover directly affected the safety of the operation of the trucks on the highways in interstate or foreign commerce.

We conclude that Risenhoover was employed and required to perform regularly and in the ordinary course of his work repairs on the trailers during each workweek of the period of his employment, and from time to time to do mechanical work on the tractor motors; that such "activities involved in the continuing duties of" his "job in all such workweeks," which included "activities which

the Commission" had "determined directly" affected "the safety of operation of motor vehicles on the public highways in transportation in interstate commerce," and such duties consumed a substantial part of Risenhoover's working time.

The reason which moved Congress to create the exemption provided for in § 13(b) (1) is obvious. Persons involved in work which directly affects the safety of operation of motor vehicles on the highways should be alert and free from work fatigue, which results from continuous long hours of extra work.

The instant case is a striking example. Here, Risenhoover worked seven days per week and from 7:30 a. m. to 5:30 p. m. or all the way to 12 midnight of each day. On many days his working time did not end until well into the night. He worked regularly on Sundays and holidays, and his workweek, according to his testimony, ran from 56 hours to 72 hours per week. Surely, his working time was far in excess of that which a person employed in activities directly affecting the safety of the operation of trucks on the public highways should work.

Employees in many cases seem to be willing to work overtime for the extra time and one-half compensation that they receive for such excess work. Employers seem willing to pay overtime to increase their weekly work output.

We think Congress deemed it essential to the safety of motor vehicle operation on the highways that the Interstate Commerce Commission should be authorized to fix the maximum hours of labor for employees engaged in work which directly affects such safety, and that the exemption provision should be construed so as to effect that Congressional intent.

Accordingly, we conclude that Risenhoover was not entitled to compensation at the rate of one and one-half times his regular rate of pay for the hours that he worked in any week in excess of the maximum hours for a workweek prescribed by the Fair Labor Standards Act.

The judgment, insofar as it required the payment by Kelley to Risenhoover of time and one-half for excess hours worked by Risenhoover, is reversed.

 Kelley was investigated three times and was warned each time of his legal duty to keep records of the hours his employees worked and the rate of pay, which he failed to do. That, and his general attitude toward the Wage and Hour provisions of the Fair Labor Standards Act, justified the injunction, except as it related to overtime compensation.

The judgment will be modified in accordance with the views above expressed, and, as so modified, affirmed.